STEPHEN A. HIGGINSON, Circuit Judge,
dissenting:
Agreeing with the district court, the plaintiff-states recognize that removal and deportation of non-citizens is a power exclusively of the federal government. See Arizona v. United States, — U.S. —, 132 S.Ct. 2492, 2498, 183 L.Ed.2d 351 (2012). Their complaint, however, is that the federal government isn’t doing its job; that whereas Congress, through unambiguous law, requires the identification, apprehension, and removal of non-citizens who lack documentation to be in the United States, see 8 U.S.C. § 1225(a)(3) (inspection); id. § 1225(b)(2)(A) (detention); id. § 1227(a) (removal), the President is thwarting that law. According to the plaintiffs, the President refuses to remove immigrants Congress has said must be removed and has memorialized that obstruction in a Department of Homeland Security (“DHS”) memorandum. This, plaintiffs contend, is a Take Care Clause violation, a Youngstown scenario courts must correct; furthermore, because deferring removal of immigrants causes states injury and has substantive impact, the plaintiffs contend that the DHS memorandum is invalid without the full apparatus of rulemaking, notice and comment and public participation, under the Administrative Procedure Act (“APA”). 5 U.S.C. § 553. The district court offered extensive viewpoints on the first point, but ruled in plaintiffs’ favor only on the second. The government seeks to stay that ruling, which is the matter before us.
My colleagues conclude that the government has not made a “strong showing” of likelihood of success on the merits. Nken v. Holder, 556 U.S. 418, 434, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009) (internal quotation marks and citation omitted). I am grateful to them for their analysis and collegiality, and our exchange has informed my views, 'although I dissent as follows.
Introduction: The Challenged Executive “Action”
On November 20, 2014, the Secretary of the Department of Homeland Security sent to the Director of U.S. Citizenship and Immigration Services, and the Acting Director of the U.S. Immigration and Customs Enforcement, and the Commissioner of the U.S. Gustoms and Border Protection a memorandum with the subject heading, “Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Re *770 spect to Certain Individuals Whose Parents are U.S. Citizens or Permanent Residents,” which aims to focus resources on illegal immigration at the border and prioritize deporting felons while lesser priority, but removable, immigrants are encouraged to self-report, pass background checks, and pay taxes on any employment they might obtain under preexisting law. See Memorandum from Jeh Johnson, Sec’y, Dep’t of Homeland Sec., to Leon Rodriguez, Dir., U.S. Citizenship and Immigration Servs., et al. (Nov. 20, 2014) (“Nov. 20 Memo”), available at kbkp://www. dhs.gov/sites/default/files/publications/14-1120-memo-deferred-action.pdf. The Office of Legal Counsel at the Department of Justice terms the memorandum “prioritization policy,” and the government in briefing to us terms it “deferred action guidance.” By contrast, plaintiffs label it a “directive,” a term adopted by the district court, which further describes the memorandum as a “program” “to award legal presence status to over four million illegal aliens.”
The November 20 memorandum, on its face, gives notice of expanded ' eligibility criteria used by DHS to assess whether undocumented immigrants who seek “deferred action” should “for a specified period of time ... [be] permitted to be lawfully present in the United States.” This memorandum, expanding on pre-existing guidance, permits undocumented immigrants who are “hard-working,” “integrated members of American society,” and “otherwise not enforcement priorities” to self-report and become a lower removal priority. The immigrant explicitly stays removable, but is not a removal priority. See Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 483-84, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999) (recognizing that deferred action, which was originally known as “nonpriority,” is an appropriate exercise of the Executive’s removal discretion); see also 8 C.F.R. § 274a.12(c)(14) (defining “deferred action” as “an act of administrative convenience to the government which gives some cases lower priority”). The parties have offered argument and submissions, but to date without adversarial and evidentiary testing, disagreeing about consequences that could follow from executive adherence to the November 20 memorandum.
I. Non-Justiciability
I would hold that Supreme Court and Fifth Circuit caselaw forecloses plaintiffs’ arguments challenging in court this internal executive enforcement guideline. In an earlier Texas v. United States, 106 F.3d 661 (5th Cir.1997), we summarized and resolved the following statutory argument:
[T]he State alleges that the Attorney General has breached a nondiscretionary duty to control immigration under the Immigration and Nationality Act. The State candidly concedes, however, that section 1103 places no substantive limits on the Attorney General and commits enforcement of the INA to her discretion.
The State’s allegation that defendants have failed to enforce the immigration laws and refuse to pay the costs resulting therefrom is not subject to judicial review. An agency’s decision not to take enforcement actions is unreviewable under the Administrative Procedure Act because a court has no workable standard against which to judge the agency’s exercise of discretion. We reject out-of-hand the State’s contention that the federal defendants’ alleged systemic failure to control immigration is so extreme as to constitute a reviewable abdication of duty. The State does not contend that federal defendants are doing nothing to enforce the immigration laws or that they have consciously decid *771 ed to abdicate their enforcement responsibilities. Real or perceived inadequate enforcement of immigration laws does not constitute a reviewable abdication of duty.
Id. at 667 (citations omitted). The authority our court relied on was Chief Justice Rehnquist’s opinion for a unanimous Supreme Court in Heckler v. Chaney, which held “that an agency’s decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency’s absolute discretion.” 470 U.S. 821, 831, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985); see also Perales v. Casillas, 903 F.2d 1043, 1047-48 (5th Cir.1990); see generally 5 U.S.C. § 701(a)(2); Ass’n of Flight Attendants-CWA, AFL-CIO v. Huerta, 785 F.3d 710, 712-16, No. 13-1316, 2015 WL 2145776, at *1-4 (D.C.Cir. May 8, 2015) (holding that the court was without jurisdiction to review an internal guidance document that “inform[s] the exercise of discretion by agents and officers in the field”).[1]
The district court repeatedly acknowledged the controlling authority of Heckler and Texas that “ ‘[r]eal or perceived inadequate enforcement of immigration laws does not constitute a reviewable abdication of duty,’ ” but held “[t]hat is not the situation here” because the November 20 memorandum is “an announced program of non-enforcement of the law that contradicts Congress’ statutory goals.” Texas v. United States, — F.Supp.3d —, —, No. B-14-254, 2015 WL 648579, at *50 (S.D.Tex. Feb. 16, 2015) (emphases added). This twofold extrapolation — focusing not on the memorandum itself set against current law, but instead on an embellishment *772 of it set against a perceived imperative to remove all illegal immigrants — rests on sublimer intelligences than existing law allows. The district court distinguished Heckler and Texas by drawing an inference of executive overreaching from two sources: first, public statements by the President, and second, the district court’s negative assessment of the earlier DACA 2012 memorandum, an assessment that our court has since rejected in Crane v. Johnson. The district court’s inferences from these two sources led it to characterize the November 20 memorandum as a presidentially “announced program” that thwarts Congress’s “goals” to remove all undocumented immigrants.[2]
This characterization is the essential point of disagreement I have with the district court’s ruling. Congress could, but has not, removed discretion from DHS as to which undocumented immigrants to apprehend and remove first. See 6 U.S.C. § 202(5) (directing Secretary to “[ejstab-lish[ ] national immigration enforcement policies and priorities”); 8 U.S.C. § 1103(a)(3) (vesting the — Secretary with broad authority to “establish such regulations; ... issue such instructions; and perform such other acts as he deems necessary for carrying out his authority” under the statute); United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 543, 70 S.Ct. 309, 94 L.Ed. 317 (1950) (describing immigration law as “ ‘a field where flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program’ ” (quoting Lichter v. United States, 334 U.S. 742, 785, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948))). Indeed, the Supreme Court recently revisited the interplay between Congressional law and coordinate Executive enforcement responsibility, clarifying that “[a] principal feature of the removal system is the broad discretion exercised by immigration officials,” who “must decide whether it makes sense to pursue removal at all,” taking into consideration, for example, “immediate human concerns,” such as “[ujnauthorized workers trying to support their families ... [who] likely pose less danger than alien smugglers or aliens who commit a serious crime.” Arizona, 132 S.Ct. at 2499; see also Crane, 783 F.3d at 249 (8 U.S.C. § 1225 “does not limit the authority of DHS to determine whether to pursue removal of the immigrant”).[3] Even specifically as to deferred *773 action, the Supreme Court has recognized that the Executive may choose to take no action “to proceed against an apparently deportable alien” because of “humanitarian reasons.” Reno, 525 U.S. at 484, 119 S.Ct. 936; see also id. at 483, 119 S.Ct. 936 (noting that “[a]t each stage” of removal, the “Executive has discretion to abandon the endeavor”). And in Crane, this court held that the DHS memorandum does not preclude the agency’s exercise of enforcement discretion, a ruling that the district court .of course did not have the benefit of. Compare Texas, — F.Supp.3d at —, 2015 WL 648579, at *55 (“Nothing about DAPA genuinely leaves the agency and its employees free to exercise discretion.” (internal quotation marks, alterations, and emphasis omitted)), with Crane, 783 F.3d at 254-55 & n. 42 (emphasizing that DACA 2012 “makes it clear that the Agents shall exercise their discretion in deciding to grant deferred action” and that the November 20 memorandum’s case-by-case review of applicants makes it “highly unlikely that the agency would impose an employment sanction against an employee who exercises his discretion to detain an illegal alien”).
The plaintiffs point to no statutory removal of the executive discretion that the Supreme Court and our court emphasize vitally exists in the law. Regardless, it is undisputed that the Executive presently is deporting a total number of immigrants at a faster rate than any administration before, ever; that the Executive is and should allocate limited resources to deport violent and dangerous immigrants, ahead of citizen — children’s parents who self-report to DHS acknowledging their illegal presence; and finally, that even categories of persons, like immigrants cooperating with the government in criminal cases or who contribute to our Armed Forces, his *774 torically receive deferrals.[4]
The district court did not view the November 20 memorandum as a non-prosecu-tipn policy. Instead, the district court reads the memorandum as agency action that affirmatively confers legal status and other benefits on undocumented immigrants. The district court, however, failed to recognize the important distinction between lawful “status” and lawful “presence.” Whereas legal status implies “a right protected by law,” - legal presence simply reflects an “exercise of discretion by a public official.” See Dhuka v. Holder, 716 F.3d 149, 156 (5th Cir.2018); see also Chaudhry v. Holder, 705 F.3d 289, 292 (7th Cir.2013) (“[U]nlawful presence and unlawful status are distinct concepts.”). The November 20 memorandum like its precursors, dating back to 1975; contemplates categorizing deferred action recipients as being present for a temporary period of time, but does not change the applicant’s lawful “status.” Congress, separately through 8 U.S.C. § 1255, has codified exact ways non-citizens may gain lawful “status,” but has left lawful “presence” broadly defined to include a discretionary “period of stay authorized by the Attorney *775 General.” 8 U.S.C. § 1182(a)(9)(B)(ii); see also Black’s Law Dictionary 565 (10th ed.2014) (defining “prosecutorial discretion” in the immigration context as “[a] federal authority’s discretion not to immediately arrest or endeavor to remove an illegal immigrant because the immigrant does not meet the federal government’s immigration-enforcement priorities”). When DHS exercises its discretion to grant a qualified and temporary reprieve from removal, the immigrants’ now-identified “presence” is thus consistent with, and furthers, Congressional enactments. See Chaudhry, 705 F.3d at 292. Non-citizens who only have lawful presence, but not lawful status, are not entitled to remain in the United States; their presence is revocable at any time. The non-citizen thus remains in the country at the discretion of DHS, who may remove the individual whenever it pleases.
The plaintiff-states draw a further flavor of doubt from eligibility for work authorization, whereas amici-states see advantage and financial windfall. That choice is exclusively a task for Congress, however. See Perales, 903 F.2d at 1045, 1047 (holding that the INS’s decision to grant work authorization has been “committed to agency discretion by law” and is therefore not subject to judicial review). Moreover, the November 20 memorandum does not itself “award” work authorization. See U.S. Dep’t of Labor v. Kast Metals Corp., 744 F.2d 1145, 1156 (5th Cir.1984) (finding a rule non-substantive because its substantive effect was “purely derivative” of another statute and rules). Work authorization for deferred-action recipients is expressly authorized under a 1981 regulation that was promulgated through notice- and-comment rulemaking. See 8 C.F.R. § 274a.12(c)(14). That authorization has since been reinforced in the United States Code. See 8 U.S.C. § 1324a(h)(3). If an influx of applications makes the statutory availability of work authorization inadvisable, it is for Congress, not the courts, to recalibrate. See, e.g., 8 U.S.C. § 1158(c)(1)(B) (directing the Secretary to grant work authorization to certain categories of non-citizens); id. § 1226(a)(3) (directing the Secretary not to grant work authorization to a certain category of non-citizens).
On this record, as well as focusing below on the four corners of the November 20 memorandum, I would say DHS is adhering to law, not derogating from it. The Supreme Court in Heckler noted that derogation and abdication occur rarely, where there is statutory language removing non-enforcement discretion yet still “a refusal by the agency to institute proceedings” or “ ‘consciously and expressly adopting] a general policy’ that is so extreme as to amount to an abdication of its statutory responsibilities.” 470 U.S. at 833 n., 105 S.Ct. 16494 (quoting Adams v. Richardson, 480 F.2d 1159, 1162 (D.C.Cir.1973)). Neither exists here. The DHS memorandum guides executive policy that has allowed enforcement and more removals per year than under any prior presidency. Although executive abdication, if renunciato-ry of Congress, extreme and diametric, must be checked, courts should not truncate the myriad political processes whereby most executive intention, good and bad, is ever balanced. See Lincoln v. Vigil, 508 U.S. 182, 193, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993) (“[W]e hardly need to note that an agency’s decision to ignore congressional expectations may expose it to grave political consequences.”); Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc., 435 U.S. 519, 543-44, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978) (“[TJhis much is absolutely clear. Absent constitutional constraints or extremely compelling circumstances the administrative agencies should be free to fashion their own rules of *776 procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties. Indeed orn-eases could hardly be more explicit in this regard.” (internal quotation marks and citations omitted)). See generally Jack M. Beermann, Congressional Administration, 43 San Diego L. Rev. 61 (2006).
In fact, if the Supreme Court has insisted on any one constant as it relates to immigration disputes, it is to redirect disputes from the multiplicity of state reactions back to dialogue between our coequal federal political branches so that nationwide concerns and practicalities are weighed, Congress’s purse dispensed as it chooses, and the Executive refines its enforcement priorities or is compelled by Congress to do so. If internal executive policy-setting authority — adjusting to limited resources and making critical offender severity determinations, all superintended by Congress — now instead becomes challengeable in courts and forced into “the often cumbersome and time-consuming mechanisms of public input,” Kast Metals, 744 F.2d at 1152, this case, as precedent, may well rise, swell, and burst with clutter beyond judicial control over immigration removal (in)action. Id. at 1156 (noting that notice and comment “would foresee aeons of rulemaking proceedings when all the agency seeks to do is operate in a rational manner”). See generally Ramah Navajo Sch. Bd. v. Babbitt, 87 F.3d 1338, 1353, 1354 (D.C.Cir.1996) (Silberman, J., dissenting) (cautioning courts against “teas[ing] statutory law out of a vacuum” created by Congress and ignoring “the zero sum game” of limited Congressional appropriations which require executive agencies to communicate prioritizations via policies).
II. Executive Policy-Setting
For the foregoing reasons, I would grant a stay of the district court’s preliminary injunction because I believe the policy articulated in the November 20 memorandum is non-justiciable.[5] See supra Part I; see also 5 U.S.C. § 701(a)(2); Perales, 903 F.2d at 1045-47. However, because the district court’s injunction rested solely on the district court’s classification of the November 20 memorandum as agency action issued without adhering to the notice and comment requirements of the APA, I articulate my disagreement on that point as well.
The district court highlighted that “well-developed” caselaw exists to distinguish executive action that is internal poliey-set- *777 ting from executive action that is a procedurally invalid legislative rule because it binds members of the public, the agency, and even courts. See Hudson v. FAA, 192 F.3d 1031, 1035-36 (D.C.Cir.1999); Syncor Int’l Corp. v. Shalala, 127 F.3d 90, 94 (D.C.Cir.1997). Judge Kavanaugh’s well-reasoned opinion in National Mining Association v. McCarthy, 758 F.3d 243 (D.C.Cir.2014), succinctly articulates the § 553 framework. Step 1, he explains, is whether the agency has said it is imposing a legally binding rule on regulatees. Id. at 251-52. Even if the agency says it is not, Step 2 asks whether the policy nonetheless draws a line in the sand, coercing conformity. Id. at 252. Finally, Step 3 asks whether post-guidance events show that agency action has become “binding on regulated parties.” Id. at 253. The district court correctly noted that “the analysis substantially relies on the specific facts of a given case.” Texas, — F.Supp.3d at —, 2015 WL 648579, at *52. Because the November 20 memorandum has yet to go into effect, and no evidentiary hearing was held, the record is undeveloped and contains considerable conjecture, and conjecture is guided by feeling.
A. Step 1: Agency Characterization
The starting point for analysis under § 553(b), though not the deciding factor, is an agency’s own characterization of its action, and specifically whether the agency itself seeks to impose binding obligations as a basis for enforcement action. Prof'ls & Patients for Customized Care v. Shalala, 56 F.3d 592, 596 (5th Cir.1995); see also East Metals, 744 F.2d at 1149; Pac. Gas & Elec. Co. v. Fed. Power Comm’n, 506 F.2d 33, 39 (D.C.Cir.1974). DHS titles its memorandum as internal policy statements expanding prosecutorial discretion for undocumented immigrants who seek “deferred action” instead of removal from the United States. That description is neither a boilerplate beginning nor a final caveat, weak bookends around an imposed regulatory regime. See Huerta, 785 F.3d at 717, 2015 WL 2145776, at *5 (“The language employed by the agency may play an important role [in determining whether a document is a policy statement or legislative rule]; a document that reads like an edict is likely to be binding, while one riddled with caveats is not.”); Nat’l Mining Ass’n, 758 F.3d at 251-53. No fewer than ten times, the November 20 memorandum instructs immigration officers that: (1) “DHS must exercise prose-cutorial discretion in the enforcement of the law”; (2) “[immigration laws] are not designed to be blindly enforced without consideration given to the individual circumstances of each case”; (3) “[d]eferred action is a form of prosecutorial discretion by which the Secretary deprioritizes an individual’s case for humanitarian reasons, administrative convenience, or in the interest of the Department’s overall enforcement mission”; (4) “deferred action is legally available so long as it is granted on a case-by-case, and it may be terminated at any time at the agency’s discretion”; (5) “[c]ase-by-case exercises of deferred action for children and long-standing members of American society who are not enforcement priorities are in this Nation’s security and economic interests and make common sense”; (6) “this Department’s limited enforcement resources ... must continue to be focused on those who represent threats to national security”; (7) “USCIS [should] establish a process, similar to DACA [2012], for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis”; (8) “ICE is further instructed to review pending removal cases ... and to refer [certain] individuals to USCIS for case-by-case determinations”; (9) “immigration officers will be provided with specific eligibility criteria for deferred *778 action, but the ultimate judgment as to whether an immigrant is granted deferred action will be determined on a case-by-case basis”; and (10) “[i]t remains within the authority of the Executive Branch ... to set forth policy for the exercise of prosecu-torial discretion and deferred action.... This memorandum is an exercise of that authority.”[6]
B. Step 2: Intent to Bind
Looking behind an agency’s stated purpose claiming or disclaiming the force and effect of law, courts also give a close, four-corners look for language that reads like an edict, commanding language, to discern if a priority statement nonetheless will operate bindingly on regulatees. Nat’l Mining Ass’n, 758 F.3d at 252 (“The most important factor concerns the actual legal effect (or lack thereof) of the agency action in question on regulated entities.”).
As a preliminary matter, it is undisputed that any “directing” here is internal only, not binding with respect to regulated entities. And to the extent that DHS directs internally, it directs immigration officers to “establish a process, similar to DACA [2012], for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis,” (emphasis added), containing features common to nonbinding statements of policy (exempt from notice and comment procedure), and dissimilar from binding substantive regulations (requiring APA rulemaking and public participation).
First, the memorandum guides only as to when to exercise broad lenity, i.e. delayed enforcement. The memorandum channels when DHS will not act, much like longstanding Department of Justice internal prosecution guidelines, such as the “Petite Policy,” which “precludes the initiation or continuation of a federal prosecution, following a prior state or federal prosecution based on substantially the same act(s) or transaction(s).... This policy constitutes an exercise of the Department’s prosecutorial discretion, and applies even where a prior state prosecution would not legally bar a subsequent federal prosecution .... ” Dual and Successive Prosecution Policy (“Petite Policy”), United States *779 Attorneys’ Manual, Title 9-2.031;[7] see also Heckler, 470 U.S. at 832, 105 S.Ct. 1649 (“[W]e note that when an agency refuses to act it generally does not exercise its coercive power over an individual’s liberty or property rights, and thus does not infringe upon areas that courts often are called upon to protect.”). The pretext cases relied on by plaintiffs, see, e.g., Appalachian Power Co. v. EPA, 208 F.3d 1015 (D.C.Cir.2000); Phillips Petroleum Co. v. Johnson, 22 F.3d 616 (5th Cir.1994); McLouth Steel Prods. Corp. v. Thomas, 838 F.2d 1317 (D.C.Cir.1988); Cmty. Nutrition Inst. v. Young, 818 F.2d 943 (D.C.Cir.1987) (per curiam), involve, contrastingly, affirmative agency action or exact nonenforcement tolerances, such as food contamination set to parts per billion specificity, not, as here, a nonprosecution memorandum built around offenders who self-report, confirm their whereabouts, submit to background checks, and stay subject to prosecution and removal while seeking employment according to law.
Second, the memorandum neither continues nor imposes a regulatory regime. There is no threat to conform. No obligation or prohibition is placed on regulated entities. Instead, DHS has expanded on its preexisting guidance, allowing immigrants to self-report their illegal presence but show they fall outside DHS’s “enforcement priorities” and also are not otherwise “inappropriate” for deferred action. The memorandum describes opt-in procedures, whose incontestable accomplishment is that persons illegally here will be identified and located and submit to a criminal background check, all the while allowing DHS to tighten border interdiction and target violent and dangerous felons. It goes without saying that to prosecute a fugitive, the government must first find him. Every applicant under the November 20 memorandum voluntarily will self-report as illegally present and provide information DHS then will use in a criminal background check coordinated with Immigration and Customs Enforcement (“ICE”) to effectuate priority removals. Nov. 20 Memo at 3 (“Case-by-case exercises of deferred action for children and long-standing members of American society who are not enforcement priorities are in this Nation’s security and economic interests and make common sense, because they encourage these people to come out of the shadows, submit to background checks, pay fees, ... and be counted.”).
Third, plaintiffs cite no § 553 caselaw relating to a statutory regime whose flexibility the Supreme Court has highlighted, Arizona, 132 S.Ct. at 2499 (“A principal feature of the removal system is the broad discretion exercised by immigration officials.”); 6 U.S.C. § 202(5) (affording the Secretary authority to “[e]stablish[ ] national immigration enforcement policies and priorities”), set against agency policy guidance that incorporates this same flexibility, such as the criteria that the applicant (1) not be an “enforcement priority”; and (2) “present no other factors that, in the exercise of discretion, makes the grant *780 of deferred action inappropriate.” Any invalidating logic must postulate the opposite of these broad caveats, therefore, both that the Supreme Court’s yes (broad discretion over removal) means no (no removal discretion), and also that DHS’s no (no blanket approvals to be present) means yes (give lawful status to millions).[8] Also illogical, future policy-setting would seem possible only when executive fíat is absolute, which in turn would maximize executive arbitrariness' — -unwritten and individualized assessments for deferred action applicants — and minimize information Congress has to perform day-to-day oversight and funding. See Richard J. Pierce, Jr., Administrative Law Treatise, § 6.3, at 424-25 (5th ed.2010) (warning of the “horrible incentives” if agencies are unable to direct their employees without “the expensive and time-consuming notice and comment procedure”).
C. Step 3: Implementation Facts
Behind label and language, courts vigilantly will look to any post-guidelines implementation data to assure, again, that an agency policy announcement does not inadvertently or strategically cause binding effect equivalent to a legislative rule. The concern is to not allow an agency speak one way — claiming resource constraints and discretion — yet carry out de facto regulation, binding regulatees. Put delicately, is the announced discretion “pretext”? Put indelicately, as the district court held, is the Executive being “disingenuous”? Texas, — F.Supp.3d at —, 2015 WL 648579, at *53.
The district court held that “[d]espite the [November 20] memorandum’s use of phrases such as ‘case-by-case’ and ‘discretion’ ” the criteria set forth in the November 20 memorandum were actually “binding.” But because it enjoined the November 20 memorandum before it went into effect, no post-guidance evidence exists to help determine “whether the agency has applied the guidance as if it were binding.” Nat’l Mining Ass’n, 758 F.3d at 253. Instead, as noted earlier, the district court looked above DHS, the executive agency, to President Obama, the executive-in-chief to find contradiction to DHS stated purpose and emphasis on case-by-case discretion. For good reason, however, the Supreme Court has not relied on press statements to discern government motivation and test the legality of governmental action, much less inaction. See Hamdan v. Rumsfeld, 548 U.S. 557, 624 n. 52, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006) (“We have not heretofore, in evaluating the legality of executive action, deferred to comments made by such officials to the media.”). Presidents, like governors and legislators, often describe law enthusiastically yet defend the same law narrowly. See Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 647, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Jackson, J.) (noting “[t]he claim of inherent and unrestricted presidential powers has long been a persuasive dialectical weapon in political controversy” yet warning against the use of such “unadjudicated claims of power” to answer constitutional questions). In addition, our court has noted that “informal communications often exhibit a lack of ‘precision of draftsmanship’ ” and there *781 fore “are generally entitled to limited weight” in the analysis of whether a rule is substantive. Prof'ls & Patients, 56 F.3d at 599 (quoting Cmty. Nutrition, 818 F.2d at 948).[9]
More significant, the district court discerned pretext — inferred intent to bind— from the fact that the majority of DACA 2012 deferred action applications have been granted. I disagree for factual and legal reasons.
First, without evidence-taking and testing, I question the relevance of DACA 2012 implementation data. The DACA 2012 memorandum purports to guide the exercise of prosecutorial discretion “with respect to individuals who came to the United States as children,” a subset of undocumented immigrants who are particularly inculpable as they “were brought to this country as children” and, thus, “lacked the intent to violate the law.” That memorandum, in its original form, applies only to individuals who came to the United States under the age of sixteen, have not yet reached the age of thirty, and who have achieved a certain level of education. The November 20 memorandum being challenged here, and specifically its DAPA provisions, on the other hand, casts a much wider net, applying to a larger and broader group of individuals, but then narrows its deferred-action-availability reach through the use of more discretionary criteria than in DACA 2012. Despite these dissimilarities, the district court concluded that “[t]here is no reason to believe that DAPA will be implemented any differently than DACA [2012]” and there was no “suggestion that DAPA will be implemented in a fashion different from DACA [2012].” Texas, — F.Supp.3d at —, — n. 96, 2015 WL 648579, at *39, *55 n. 96. The court did not explore, however, the government’s contention that a significant difference existed between the two programs, specifically, the catch-all discretionary exception that was added to the November 20 memorandum — “present no other factors that, in the exercise of discretion, makes the grant of deferred action inappropriate.” The district court rejected this distinction because, the court contended, using circular reasoning, that the approval rate under the DACA 2012 program persuaded the Court that “this ‘factor’ is merely pretext.” Id. at — n. 101, 2015 WL 648579 at *55 n. 101.
Second, the district court placed the burden on the government to put forth “evidence of individuals who had been denied [under DACA 2012] for reasons other than not meeting the criteria or technical errors with the form and/or filing.” Id. But “[t]he plaintiff has the burden of introducing sufficient evidence to justify the grant of a preliminary injunction.” See PCI Transp., Inc. v. Fort Worth & W.R. Co., 418 F.3d 535, 545 (5th Cir.2005). The district court then reached its conclusions about the agency’s binding intent without giving any weight to the government’s contrary evidence or justification for discrediting that evidence. See Four Seasons Hotels and Resorts, B.V. v. Consorcio Barr, S.A., 320 F.3d 1205, 1211 (11th Cir.2003) (holding that the district court abused its discretion when it “effectively issued and upheld the injunction based on evidence presented by only one party” and without holding an evidentiary hearing); cf. Fed. Sav. & Loan Ins. Corp. v. Dixon, 835 F.2d 554, 558-59 (5th Cir.1987) (finding that the district court did not abuse its discretion by declining to hold an eviden-tiary hearing where there were no materi *782 al factual disputes). Especially because this case touches on the sensitive issues of immigrant presence in the United States, as well as when one branch of government may invalidate internal guidelines of another branch, I do not think it should come resolved on inferences of disingenu-ousness made from press statements and untested inferences from a precursor program whose challenge on similar grounds our court has rejected. See Crane, 783 F.3d 244. No evidentiary hearing was held. For example, Kenneth Palinkas’s contention that DACA 2012 applicants are “rubber-stamped” was not tested against Donald Neufeld’s specific examples of discretionary denials.[10] See Sims v. Greene, 161 F.2d 87, 88 (3rd Cir.1947) (“Such conflict [between allegations in competing pleadings and affidavits] must be resolved by oral testimony since only by hearing the witnesses and observing their demean- or on the stand can the trier of fact determine the veracity of the allegations ... made by the respective parties. If witnesses are not heard the trial court will be left in the position of preferring one piece of paper to another.”); Heil Trailer Int’l Co. v. Kula, 542 Fed.Appx. 329, 334 n. 17 (5th Cir.2013) (“[I]t is fundamental that, ‘[i]f there is a factual controversy, ... oral testimony is preferable to affidavits because of the opportunity it provides to observe the demeanor of the witnesses.’ ” (citation omitted)); see also Four Seasons, 320 F.3d at 1211 (“Where conflicting factual information place[s] in serious dispute issues central to [a party’s] claims and much depends upon the accurate presentation of numerous facts, the trial court err[s] in not holding an evidentiary hearing to resolve these hotly contested issues.” (citations and internal quotation marks omitted)); 11 Charles Alan Wright et al., Federal Practice and Procedure § 2949 (3d ed.) (“When the outcome of a Rule 65(a) application depends on resolving a factual conflict by assessing the credibility of opposing witnesses, it seems desirable to require that the determination be made on the basis of their demeanor during direct and cross-examination, rather than on the respective plausibility of their affidavits.”).' As a second example, Jeh Johnson, the author of what is held disingenuous, was not heard from. His ten instructions requiring individualized, case-by-case assessment were not tested as pretext. When a court assesses unlawful motive and declares executive action invalid nationwide, highest government officials-whose veracity is entirely discredited should be heard. Indeed, the District of Columbia Circuit commendably has developed a “curative option” short of complete invalidation . for such circumstances. McLouth, 838 F.2d at 1324 (remanding to permit agency to demonstrate that it is “truly exereisfing] discretion in individual” cases). This intermediate remedy seems especially noteworthy because of our intervening Crane decision, which calls into *783 doubt the district court’s basis for inferring disingenuousness.[11]
Third, DACA 2012 itself contains classic markers of discretion, including the ability to interview applicants, request additional evidence, and contact the applicant’s educational institution, other government agencies, employers, or other entities to verify documents and facts. This discretion was actually exercised by DIJS; the executive made nearly 200,000 requests for additional evidence under the DACA 2012 program, a fact the district court does not mention. Applications have been denied after an official exercised discretion in applying the criteria set forth in the DACA 2012 memorandum (i.e., making a subjective determination that the applicant posed a public safety risk), and for reasons not expressly set forth in the DACA 2012 memorandum.
Fourth, and especially significant, placing determinative weight on the approval rate of applicants under DACA 2012 fails to take into account the crucial voluntary aspect of this memorandum, that applicants will not apply if they are ineligible— essentially self-reporting for removal — or, if eligible, when they have any other flaw they do not want revealed. In light of this manifest self-selection bias, it is unclear why the appropriate piece of data would be the approval rate of only applicants, crucially relied on by the district court to infer pretext, rather than the approval rate of all those who qualify. Again, the district court did not address at all this self-selection bias inherent in DACA 2012 and the November 20 memorandum.
Finally, as a leading administrative law scholar has observed, it is to be expected and encouraged that subordinate executive officers will follow enforcement guidelines. See Pierce, Administrative Law Treatise, § 6.3, at 424-25; see also Prof'ls & Patients, 56 F.3d at 599 (agents’ conformance with agency guidance is “not particularly probative whether the rule is substantive” because “what purpose would an agency’s statement of policy serve if agency employees could not refer to it for guidance?”). This positive should not become a negative to invalidate the very delineation of executive authority the APA exists to assure.
D. Commonsense
Judge Kavanaugh brackets his National Mining Association framework for the § 553 analysis applied above with commonsense. First, he offers that “agency action that merely explains how the agency will enforce a statute ... in other words, how it will exercise its broad enforcement discretion or permitting discretion under some extant statute or rule — is a general statement of policy.” Nat’l Mining Ass’n, 758 F.3d at 252. The Supreme Court, in Arizona, resolved that immigration officials have “broad discretion” to enforce the federal immigration laws, including the “deci[sion] whether it makes sense to pursue removal at all.” Arizona, 132 S.Ct. at 2499. Second, Judge Kavanaugh notes that a token of a general statement of policy is that the agency would have legal authority to undertake the action absent the guidance' document. See Nat’l Mining Ass’n, 758 F.3d at 253 (“[Wjhen the agency applies [a general statement of] policy in a particular situation, it must be prepared to support the policy just as if the policy statement had never been issued.” (internal quotation marks and citation *784 omitted)). As described earlier, deferred action has existed for half a century, reflected in longstanding regulations as an “act of administrative convenience,” see 8 C.F.R. § 274a.12(c)(14), and recognized by the Supreme Court as an appropriate exercise of the Executive’s removal discretion, see Reno, 525 U.S. at 483-84, 119 S.Ct. 936. Indeed, the same deferred action decisions for which the November 20 memorandum provides guidance already are permissible under the unchallenged 2014 enforcement priorities memorandum, which is explicitly incorporated into the November 20 memorandum. See Memorandum from Jeh Charles Johnson, Policies for the Apprehension, Detention and Removal of Undocumented Immigrants (Nov. 20, 2014). The November 20 memorandum, by incorporating a framework the plaintiffs admit is discretionary, necessarily contains at least that identical level of discretion.
Conclusion
I would hold that the underlying issue presented to us — the order in which non-citizens without documentation must be removed from the United States — must be decided, presently is being decided, and always has been decided, by the federal political branches. See Mathews v. Diaz, 426 U.S. 67, 81, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976) (“For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government.”). On the expedience of immigration measures, sensible things can be said on all sides, mindful that our country is an immigrant society itself.[12] The political nature of this dispute is clear from the names on the briefs: hundreds of mayors, police chiefs, sheriffs, attorneys general,, governors, and state legislators — not to mention 185 members of Congress, 15 states and the District of Columbia on the one hand, and 113 members of Congress and 26 states on the other. I would not affirm intervention and judicial fiat ordering what Congress has never mandated.

. Because I believe that Heckler compels the conclusion that the November 20 memorandum is non-justiciable, I would not reach the issue of standing. At this emergency-stay point, I would noté only that there has been little developed guidance from lower courts on how far Massachusetts v. EPA's logic extends for plaintiff-states beyond the facts of that case, which involved a state that asserted an injury based on its own property interests and the relevant statute provided an explicit right to challenge the denial of a rulemaking petition. See 549 U.S. 497, 518-20, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007). Furthermore, Texas's inability to articulate a limiting principle to its drivers' license theory of standing— triggered, it appears, by any federal executive policy that leads to the grant of even one deferred action request — as well as countervailing developments in this court and others, suggest to me that Massachusetts v. EPA may not apply here. See Crane v. Johnson, 783 F.3d 244, 247 (5th Cir.2015) (holding that the State of Mississippi had not “demonstrated the concrete and particularized injury required to give [it] standing to maintain [its] suit” against the precursor DHS memorandum); Arpaio v. Obama, 27 F.Supp.3d 185, 207 (D.D.C.2014) (holding that Sheriff Arpaio did not have standing to challenge the precursor DHS memorandum); see also Daimler-Chrysler Corp. v. Cuno, 547 U.S. 332, 346, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006) (holding that plaintiffs do not have standing by virtue of their status as taxpayers to challenge the conferral of tax credits on third parties); Pennsylvania v. New Jersey, 426 U.S. 660, 664, 96 S.Ct. 2333, 49 L.Ed.2d 124 (1976) (per curiam) (holding that Pennsylvania lacked standing to challenge a New Jersey tax that triggered a Pennsylvania tax credit because "nothing prevent[ed] Pennsylvania from withdrawing that credit for taxes paid to New Jersey” and explaining that "[n]o State can be heard to complain about damage inflicted by its own hand”); Linda R.S. v. Richard D., 410 U.S. 614, 619, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973) (emphasizing that a third party "lacks a judicially cognizable interest in the prosecution or nonprosecution of another”); Henderson v. Stalder, 287 F.3d 374, 384 (5th Cir.2002) (Jones, J., concurring) (“[A] plaintiff who complains merely that a benefit has been unconstitutionally granted to others is asserting only a ‘generalized grievance’ that does not allow the plaintiff standing to obtain judicial relief for the alleged wrong in federal court.”). Given the debatability of the plaintiff-states' attenuated theory of standing, I would therefore resolve this matter on the threshold issue of non-justiciability.

. The district court's April 7, 2015 order, revisiting its stay, reinforces, in my opinion, this error. The April 7 order rests even more determinatively on press statements of the President to re-emphasize both that "[t]his is not merely ineffective enforcement^] [t]his is " total non-enforcement,” and also, contrary to our intervening Crane decision, that "[i]f there were any doubts that the 2014 DHS Directive is correctly characterized as 'substantive,' the President's warning to DHS employees of adverse consequences for failing to follow the Directive should clearly extinguish . those.” Compare April 7 Memorandum Opinion & Order (observing that immigration officers not only lack discretion but will suffer consequences), with Crane, 783 F.3d at 254-55 (holding that DACA 2012’s guidelines and the November 20 memorandum’s guidelines afford immigration officers discretion to grant or withhold deferred action on a case-by-case basis).

. As with criminal law enforcement generally, there is no one immigration imperative and blueprint the Executive must follow. See Adam B. Cox & Cristina M. Rodriguez, The President and Immigration Law, 119 Yale L.J. 458, 463, 510-11 (2009) (contending that the "detailed, rule-bound immigration code” developed by Congress “has had counterintui-tive consequences of delegating tremendous authority to the President to set immigration screening policy by making a huge fraction of noncitizens deportable at the option of the Executive”). Prosecution, as a core executive duty, has elasticity, ranging from nonpro-secution altogether, variable and selected charges, guilty plea flexibility, and recommendations for sentencing leniency or severi *773 ty. See, e.g., City of Seabrook v. Costle, 659 F.2d 1371, 1374 n. 3 (5th Cir.1981) (Although “the word 'shall' is normally interpreted to impose a mandatory duty, ... when duties within the traditional realm of prosecutorial discretion are involved, the courts have not found this maxim controlling.'' (internal citation omitted)); Inmates of Attica Corr. Facility v. Rockefeller, 477 F.2d 375, 381 (2d Cir.1973) (holding that mandatory statutory language directing that each United States attorney "shall ... prosecute for all offenses against the United States" "has never been thought to preclude the exercise of prosecu-torial discretion”). This elasticity was described over a half century ago by the Supreme Court in Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935) (a prosecutor’s interest "in a criminal prosecution is not that it shall win a case; but that justice shall be done.”). Even more so in the immigration context, the Supreme Court has been sensitive to unique concerns beyond humanitarian circumstances and limited-resources, especially foreign policy. See Arizona, 132 S.Ct. at 2499 ("The dynamic nature of relations with other countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation’s foreign policy....”); Harisiades v. Shaughnessy, 342 U.S. 580, 588-89, 72 S.Ct. 512, 96 L.Ed. 586 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.”); cf. 8 U.S.C. § 1252(g) (recognizing the executive branch's authority to exercise prosecuto-rial discretion by generally stripping courts' jurisdiction to hear any claim “by or on behalf of any alien” arising from the Executive’s decision to "commence proceedings, adjudicate cases, or execute removal orders against any alien”); Hiroshi Motomura, Immigration Law After a Century of Plenary Power: Phantom Constitutional Norms and Statutory Interpretation, 100 Yale L.J. 545, 547 (1990) ("[Cjourts should only rarely, if ever, and in limited fashion, entertain constitutional challenges to decisions about which aliens should be admitted or expelled.”).

. The Executive’s granting of temporary reprieve from prosecution to categories of individuals is neither new nor uncommon. This occurred, to begin with an example in the immigration context, with the Family Fairness program. In 1987, the INS announced a policy of deferring the deportations of certain children whose parents received legal status under recent legislation. See Legalization and Family Faimess-An Analysis, 64 Interpreter Releases 1190, 1200-1204 (Oct. 26, 1987) (containing policy by Alan C. Nelson, INS Commissioner, providing that ''indefinite voluntary departure shall be granted” to these children). In 1990, the INS expanded its deferral program to include certain spouses of legalized persons. Memorandum from Gene McNary, Comm’r, Immigration and Naturalization Serv., to Regional Commissioners, Family Fairness: Guidelines for Voluntary Departure (Feb. 2, 1990) (providing that “[v]oluntary departure will be granted for a one-year period”). The Family Fairness program was effectively codified by Congress later that year. Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 (Nov. 29, 1990). The practice of immigration parole, which "permits a person’s physical presence in the United States even when she could not legally be granted formal admission,” also "originated as a purely administrative innovation.” David A. Martin, A Defense of Immigration-Enforcement Discretion, 122 Yale L.J. Online 167, 178 (2012) (noting that “[t]he practice was well established by the time parole gained explicit statutory sanction in the original 1952 Immigration and Nationality Act”). In the larger criminal context — such as the recent nonprosecution of banks that self-report regarding overseas tax infractions, or nonprosecution of possession of personal use amounts of marijuana — deferred prosecution is common (and more consequential because statutes of limitations make it binding legally). Indeed, the practice of pretrial diversion, set forth in the United States Attorney's Manual, began as an executive initiative, without express statutory authorization, announced by Assistant Attorney General Burke Marshall in 1964, and then expanded in 1974 by then — Deputy Attorney General Laurence Silberman, before the Pretrial Services Act of 1982 was enacted. See Pre-Trial Diversion: Healing on H.R. 9007 and S. 798 Before the Subcomm. on Courts, Civil Liberties, and the Admin, of Justice of the H. Comm, on the Judiciary, 93d Cong. 127-28 (1974); Stephen J. Rackmill, PHntzlien’s legacy, the “Brooklyn Plan," A.K.A. Defetred Prosecution, 60 Fed. Probation 1, 8, 10, 14 (June 1996). Such clear and announced enforcement guidelines do several things. They channel limited resources by prioritizing targeted felons. They animate the political process so that executive policy-setting either proves its worth and becomes embodied in law, as with pretrial diversion or the Family Fairness program, or oppositely, for myriad reasons — unworkability, unpopularity, or budgetary realities — policies are rescinded or countermanded by law. Third, nonprosecution necessarily means that persons not being'prosecuted, arrested, and detained will seek work according to preexisting law, pay taxes,, and parent children. See Nov. 20 Memo at 3 (case-by-case exercises of deferred action will "encourage [people] to come out of the shadows ... and be counted”).

. Absent non-justiciability, I would agree that there is a reason to maintain the status quo pending the government's approaching appeal on the merits. Compare INS v. Legalization Assistance Project of the L.A. Cnty. Fed’n of Labor, 510 U.S. 1301, 1306, 114 S.Ct. 422, 126 L.Ed.2d 410 (1993) (O'Connor, Circuit Justice) (granting an application to stay the district court's order that required enforcement of INS regulations when the district court’s order was "an improper intrusion by a federal court in the workings of a coordinate branch of the Government”), with Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott, — U.S. —, 134 S.Ct. 506, 509, 187 L.Ed.2d 465 (2013) (Breyer, J„ dissenting) ("[I]t is a mistake to disrupt the status quo so seriously before the Fifth Circuit has arrived at a considered decision on the merits.”), and Campaign for S. Equality v. Bryant, 773 F.3d 55, 58 (5th Cir.2014) (granting a stay pending appeal in part because "a temporary maintenance of the status quo” prevents the "inevitable disruption that would arise from a lack of continuity and stability in [an] important area of law”). See generally Jill Wieber Lens, Stays Pending Appeal: Why the Merits Should Not Matter, Fla. St. U. L. Rev. (forthcoming) (manuscript at 35), available at http://ssrn.com/abstract=2571003 (arguing that panels reviewing motions for stay pending appeal should consider "whether the circumstances would (irreparably change) in a way that would interfere with the appellate court’s ability to malee a decision meaningful to the parties”).

. In this regard, also, the November 20 memorandum is consistent with prior deferred action guidance dating back to at least 1975, which structure executive discretion to delay removal of immigrants who are not priorities for removal. See Immigration and Naturalization Service Operating Instruction 103.1(a)(l)(ii) (1975); Memorandum from Sam Bernsen, Legal Opinion Regarding Service Exercise of Prosecutorial Discretion (July 15, 1976); Memorandum from Bo Cooper, INS Exercise of Prosecutorial Discretion (July 11, 2000); Memorandum from Doris Meiss-ner, Commissioner, Immigration and Naturalization Service, to Regional Directors et al., Exercising Prosecutorial Discretion (Nov. 17, 2000); Memorandum from William J. Howard, Principal Legal Advisor, ICE, to All Office of the Principal Legal Advisor Chief Counsel, Prosecutorial Discretion (Oct. 24, 2005); Memorandum from Julie L. Myers, Assistant Secretary of Homeland Security, to All Field Office Directors and Special Agents in Charge of U.S. Immigration and Customs Enforcement, Prosecutorial and Custody Discretion (Nov. 7, 2007); Memorandum from John Morton, Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens (June 17, 2011). In several instances, prior policies on deferred action were held to be exempt from requirements in § 553. See Mada-Luna v. Fitzpatrick, 813 F.2d 1006, 1009 (9th Cir.1987) (rejecting claim that the 1981 version of INS Operating Instruction 103.1(a)(l)(ii) "violated the notice-and-com-meiit requirements of the APA, because the amended Operating Instruction qualifies under the APA’s exception for 'general statements of policy’ "); Pasquini v. Morris, 700 F.2d 658, 662 (11th Cir.1983) (concluding that Operating Instruction 103.1(a)(l)(ii) was exempt from § 553(b) because it was "only general guidance for service employees” (internal quotation marks and citation omitted)).

. The Petite Policy, like many other law enforcement policies, is a policy governing pros-ecutorial discretion as to an undefined class of similarly situated persons that has no express statutory authorization and has never been challenged as ultra vires, either violative of APA rulemaking or as an abdication from the Take Care duty to enforce the federal criminal code. See Heckler, 470 U.S. at 832, 105 S.Ct. 1649 C‘[A]n agency’s refusal to institute proceedings shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict — a decision which has long been regarded as the special province of the Executive Branch, inasmuch as it is the Executive who is charged by the Constitution to 'take Care that the Laws be faithfully executed.' ” (citation omitted)).

. In its April 7, 2015 supplemental order, the district court construes remarks by the President as a threat to immigration officers to conform to the November 20 memorandum. However, the memorandum instructs officials to use discretion and make case-by-case determinations, so any invalidating logic must actually be that officials understand the threat to mean they must do the opposite of what is in writing, and apply criteria blindly, ignore discretionary criteria, and decline to make case-by-case determinations.

. Much less informally, Presidents often in presidential signing statements say they will not enforce aspects of law, yet no court has used such statements to classify subsequent agency inaction as an intent to bind triggering the APA rulemaking process.

. The government presented a 13-page affidavit of Donald Neufeld, USCIS Associate Director for Service Center Operations, accompanied by over 40 pages of exhibits, which purported to show that USCIS maintains authority and discretion to grant deferred action to non-DAPA applicants and to deny deferred action to applicants who meet the November. 20 memorandum's listed criteria. The affidavit describes specific examples of instances when USCIS denied DACA 2012 requests for discretionary reasons that were not contemplated by the DACA 2012 guidelines. This affidavit was based on Neufeld's personal knowledge gained during the course of his official duties. Significantly, the district court never mentions Neufeld, and its only reference to his proof was its early rejection of the entire declaration and exhibits, without any detailed discussion, as not providing "the level of .detail that the Court requested.” Texas, — F.Supp.3d at —, 2015 WL 648579, at *5.

. If a concern is that the unanimous panel in Crane itself lacked evidentiary foundation, it would seem even more advisable to require actual and adversarial evidence-taking, avoiding either agency action that is feared to be disingenuous or, an opposite extreme, requiring DHS to prioritize its limited resources only through full public participation.

. Over twenty years ago, Judith Shklar observed in her book American Citizenship, aptly subtitled The Quest for Inclusion, that the United States has an "extremely complicated” history of "exclusions and inclusions, in which xenophobia, racism, religious bigotry, and fear of alien conspiracies have played their part.” Judith N. Shklar, American Citizenship: The Quest for Inclusion 4 (1991). And over two hundred years ago, our non-citizen forebears grieved against their king that, "[h]e has endeavoured to prevent the population of these States; for that purpose obstructing the Laws for Naturalization of Foreigners; refusing to pass others to encourage their migrations hither.” The Declaration of Independence (U.S. 1776).