# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 10, 2014        Decided May 8, 2015

No. 13-1316

ASSOCIATION OF FLIGHT ATTENDANTS-CWA, AFL-CIO,
PETITIONER

v.

MICHAEL P. HUERTA AND FEDERAL AVIATION
ADMINISTRATION,
RESPONDENTS

On Petition for Review from the
Federal Aviation Administration

*Amanda C. Dure* argued the cause for petitioner. With her on the briefs was *Michael J. Pangia*.

*Jeffrey E. Sandberg*, Attorney, U.S. Department of Justice, argued the cause for respondents. With him on the brief were *Stuart F. Delery*, Assistant Attorney General, *Ronald C. Machen*, *Jr.*, U.S. Attorney at the time the brief was filed, and *Mark B. Stern*, Attorney.

Before: ROGERS, *Circuit Judge*, BROWN, *Circuit Judge*, and EDWARDS, *Senior Circuit Judge*.

EDWARDS, *Senior Circuit Judge*: On October 31, 2013, the Federal Aviation Administration ("FAA") issued FAA Notice N8900.240, *Expanded Use of Passenger Portable Electronic Devices* ("Notice N8900.240" or "the Notice"). The Notice is an internal guidance document issued to FAA aviation safety inspectors concerning the use and stowage of portable electronic devices ("PEDs") aboard commercial and other aircraft. On December 30, 2013, the Association of Flight Attendants ("AFA") filed a petition for review with this court challenging Notice N8900.240 on the ground that "the FAA impermissibly and substantially altered and effectively amended 14 C.F.R. § 121.589, the regulation that pertains to carry-on baggage on an aircraft," without adhering to the notice and comment requirements of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553. Petitioner's Br. 5.

The AFA seeks to invoke this court's jurisdiction under 49 U.S.C. § 46110(a), which provides that "a person disclosing a substantial interest in an order issued by" the FAA "may apply for review" in this court "not later than 60 days after the order is issued." The FAA claims that this court lacks jurisdiction over the petition for review because the Notice does not constitute final agency action. *See, e.g.*, *Vill. of Bensenville v. FAA*, 457 F.3d 52, 68 (D.C. Cir. 2006) (noting that jurisdiction under 49 U.S.C. § 46110(a) is limited to review of "final order[s]"). We agree.

In order for an agency action to be viewed as "final agency action" it "must mark the 'consummation' of the agency's decisionmaking process," rather than being "tentative or interlocutory." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation omitted). And it must determine "rights or obligations," or produce "legal consequences." *Id.* at 178 (internal quotation marks omitted). Notice N8900.240 does not satisfy these requirements. The Notice is nothing

more than an internal guidance document that does not carry the "force and effect of law." *Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1204 (2015). Therefore, the Notice does not reflect final agency action.

It does not matter that Notice N8900.240 may reflect a change in the FAA's interpretation of the regulation embodied in 14 C.F.R. § 121.589. In *Perez*, the Supreme Court explained that:

> Not all "rules" must be issued through the notice-and-comment process. Section 4(b)(A) of the APA provides that, unless another statute states otherwise, the notice-and-comment requirement "does not apply" to "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A). . . . [T]he critical feature of interpretive rules is that they are "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." The absence of a notice-and-comment obligation makes the process of issuing interpretive rules comparatively easier for agencies than issuing legislative rules. But that convenience comes at a price: Interpretive rules "do not have the force and effect of law and are not accorded that weight in the adjudicatory process."

*Id*. at 1203–04 (citations omitted). As *Perez* makes clear, the APA "permit[s] agencies to promulgate freely [interpretive] rules – whether or not they are consistent with earlier interpretations" of the agency's regulations. *Id*. at 1207; s*ee also Hudson v. FAA*, 192 F.3d 1031, 1035–36 (D.C. Cir. 1999) (holding that an agency may change its policy statements as it sees fit without following APA notice and comment procedures). Such agency interpretations and policy

statements do not "amend" the regulations to which they refer. As noted in *Perez*, "[o]ne would not normally say that a court 'amends' a statute when it interprets its text. So too can an agency 'interpret' a regulation without 'effectively amend[ing]' the underlying source of law." *Id.* at 1208 (alteration in original).

On the record before us, it is clear that Notice N8900.240 does not purport to amend any FAA regulation, and it does not otherwise carry the force of law. FAA regulations prohibit the use of most PEDs during flight unless an airline determines that they will not interfere with the aircraft's navigation or communications. 14 C.F.R. § 121.306. The FAA has long advised that PED use be allowed during the main portion of flights, but barred during takeoff and landing. Although the agency's recommendations are nonbinding, most airlines followed this approach. In 2012, the FAA reconsidered its stance. The agency created a streamlined procedure for airlines to use to determine whether expanded PED use poses a safety risk. Although the FAA's guidance on PEDs remained nonbinding, many airlines have adopted new procedures that permit passengers to use PEDs for the entire duration of their flights.

Notice N8900.240 does not alter this regulatory regime. The Notice merely provides guidance to aviation safety inspectors who enforce FAA regulations. Moreover, Notice N8900.240 creates no rights or obligations, and generates no legal consequences. No airline need alter any policy in response to it. The Notice does not eliminate the discretion of safety inspectors or require that any particular carry-on baggage program be approved or denied. And the Notice does not contradict existing regulations regarding stowage of carry-on baggage.

In sum, because the disputed Notice does not determine any rights or obligations, or produce legal consequences, it does not reflect "final action" by the FAA. Therefore, this court has no jurisdiction to consider AFA's challenge to Notice N8900.240.

## I. BACKGROUND

The FAA requires airlines to have an agency-approved carry-on baggage program to control the size and amount of luggage that passengers can bring aboard their planes. 14 C.F.R. § 121.589(a). Passenger aircraft cannot take off unless each article of baggage is stowed in an appropriate compartment or under a seat. *Id.* § 121.589(b), (c). The regulations do not define carry-on baggage, however. Instead, FAA guidance documents instruct airlines to describe "what you include in the term 'Carry-On Baggage'" as part of a carry-on baggage program. FAA Advisory Circular No. 121-29B, *Carry-On Baggage* (2000), at 2.

FAA regulations nominally ban the operation of most PEDs during flight, save for portable voice recorders, hearing aids, pacemakers, and electric shavers. 14 C.F.R. § 121.306. However, this regulation contains a broad exception allowing for the use of any device that the airline determines "will not cause interference with the navigation or communication system of the aircraft." *Id.* § 121.306(b)(5). Since the late 1950s, the FAA has worked with the airline industry to study the risks involved in PED use and produce guidance documents to assist airlines in making safety determinations about device usage during flight. Prior to 2012, the FAA recommended that airlines allow passengers to use devices during the main portion of a flight, but prohibit use during takeoff and landing. This guidance was nonbinding; however, most airlines followed the FAA recommendation because the

agency provided no direction on how to demonstrate that devices could be used safely during takeoff and landing.

The FAA decided to reevaluate its safety recommendations in 2012. The agency published a notice in the Federal Register seeking public comment on its guidance to airlines regarding how to determine whether and when electronic devices are safe for in-flight use. In the notice, the agency "stress[ed] that the existing regulations allow [airlines] to authorize the use of PEDs, and that no specific FAA approval is required." Passenger Use of Portable Electronic Devices on Board Aircraft, 77 Fed. Reg. 53,159-02, 53,160 (Aug. 31, 2012). More than a thousand comments were submitted, including one by the AFA. As promised in the notice, the FAA assembled an Aviation Rulemaking Committee ("Committee") to review the comments and recommend changes to the agency's policies. The Committee was composed of representatives from a variety of stakeholder groups, including the AFA.

The Committee's report, issued on September 30, 2013, made technical and operational recommendations aimed at helping airlines safely expand passenger use of PEDs. The Committee designed a method for airlines to use in assessing whether passengers can safely keep their devices on during takeoff and landing. The AFA representative dissented from the method recommended by the Committee, advocating instead for a more conservative approach. The Committee also recommended that the FAA update its policy and guidance documents on the stowage of baggage and other items to accommodate expanded use of PEDs. This recommendation was unanimous.

In response to the report, the FAA produced two sets of guidance documents. The first, FAA Information for

Operators 13010, *Expanding Use of Passenger Portable Electronic Devices (PED)* (2013), and its supplement, are directed at airlines interested in allowing passengers to use PEDs during takeoff and landing. These documents lay out a roadmap, based on the Committee's recommendations, for evaluating aircraft and revising policies so that an airline can safely permit expanded PED use. Among other things, the guidance instructs airlines to write policies ensuring that devices are "properly secured and stowed" during takeoff and landing. FAA Information for Operators 13010 Supplement (2014), at 6. "Secured" and "stowed" are not synonyms. The guidance explains that "stowed" means placing an object in an approved carry-on stowage location certified to hold its mass during an emergency landing. *Id.* at 14. "Secured" means restrained in an area that is not so certified. *Id.* The guidance instructs that large devices like laptops must be stowed in approved carry-on locations. *Id.* However, small devices can simply be secured in armbands, garment pockets, or in hand. *Id.* The AFA has not challenged this guidance.

The second guidance document, Notice N8900.240, is addressed to the FAA's aviation safety inspectors. The Notice explains the new guidance to airlines, and states that the agency does not need to approve an airline's finding that expanded PED use will not interfere with flight safety. Notice 8900.240 at 1–2. The Notice also observes that expanding PED use may necessitate revisions to an airline's policies and documentation, including carry-on baggage programs. The Notice lists some "general concerns" that a modified carry-on baggage program "should address." *Id.* at 3. For example, "[l]arge PED, such as full-size laptops, must be safely stowed so as not to present a hazard in the event of severe turbulence, crash forces, or emergency egress." *Id.* The Notice thus gives guidance to aviation safety inspectors to assist them in addressing issues that airlines may face in connection with

expanded passenger use of PEDs. It does not, however, compel the airlines to do anything.

On December 30, 2013, the AFA filed a petition for review of the Notice in this court. The AFA asks that the Notice be set aside on the grounds that the portion allowing small PEDs to remain secured (rather than stowed) during takeoff and landing is arbitrary, capricious, contrary to existing regulations, and was improperly promulgated without notice and comment.

## II. ANALYSIS

### A. *Legal Standard*

As noted above, the AFA seeks to invoke this court's jurisdiction under 49 U.S.C. § 46110(a). Section 46110(a) permits "a person disclosing a substantial interest in an order issued by the Secretary of Transportation . . . [to] apply for review of the order by filing a petition for review" in the court of appeals. However, in order for us to entertain a petition under this section, the challenged order "must possess the quintessential feature of agency decisionmaking suitable for judicial review: finality." *City of Dania Beach v. FAA*, 485 F.3d 1181, 1187 (D.C. Cir. 2007) (quoting *Vill. of Bensenville*, 457 F.3d at 68). A final order has two key qualities. First, it "must mark the 'consummation' of the agency's decisionmaking process," rather than being "tentative or interlocutory." *Bennett*, 520 U.S. at 177–78 (citation omitted). Second, it must determine "rights or obligations," or produce "legal consequences." *Id.* at 178 (internal quotation marks omitted).

In litigation over guidance documents, the finality inquiry is often framed as the question of whether the challenged

agency action is best understood as a non-binding action, like a policy statement or interpretive rule, or a binding legislative rule. *See Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 806 (D.C. Cir. 2006). A policy statement "explains how the agency will enforce a statute or regulation – in other words, how it will exercise its broad enforcement discretion or permitting discretion under some extant statute or rule." *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014). It serves to "appris[e] the regulated community of the agency's intentions as well as informing the exercise of discretion by agents and officers in the field." *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 949 (D.C. Cir. 1987). Policy statements "are binding on neither the public nor the agency," and the agency "retains the discretion and the authority to change its position . . . in any specific case." *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997) (citations omitted). Policy statements are excepted from the requirements of notice and comment rulemaking. *See* 5 U.S.C. § 553(b)(3)(A).

The same is true with respect to interpretive rules, which are "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Perez*, 135 S. Ct. at 1204 (quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995)). Interpretive rules do not carry the force and effect of law, and they need not be promulgated pursuant to notice and comment procedures under the APA. *Perez*, 135 S. Ct. at 1203–04. And "[b]ecause an agency is not required to use notice-and-comment procedures to issue an initial interpretive rule, it is also not required to use those procedures when it amends or repeals that interpretive rule." *Id.* at 1206. Thus, under *Perez*, it is clear that an agency does not "amend" an established regulation merely by issuing a new interpretation of the regulation. *Id.* at 1207–08.

In this case, it really does not matter whether Notice N8900.240 is viewed as a policy statement or an interpretive rule. The main point here is that the Notice is not a legislative rule carrying "the force and effect of law." *Perez*, 135 S. Ct. at 1204. A legislative rule "*modifies* or *adds* to a legal norm based on the agency's *own authority*" flowing from a congressional delegation to engage in supplementary lawmaking. *Syncor*, 127 F.3d at 95. The APA requires such rules to be promulgated pursuant to notice and comment. *Id.* "A properly adopted substantive rule establishes a standard of conduct which has the force of law." *Pac. Gas & Elec. Co. v. Fed. Power Comm'n*, 506 F.2d 33, 38 (D.C. Cir. 1974). Agency actions that "impose legally binding obligations or prohibitions on regulated parties" or "set[] forth legally binding requirements for a private party to obtain a permit or license" are legislative rules. *Nat'l Mining*, 758 F.3d at 251–52.

The point at which a purported guidance document crosses over from being a non-binding policy statement or interpretive rule to a legislative rule sometimes may be "enshrouded in considerable smog." *Cmty. Nutrition*, 818 F.2d at 946 (internal quotation marks omitted). The most important factor in differentiating between binding and non-binding actions is "the actual legal effect (or lack thereof) of the agency action in question." *Nat'l Mining*, 758 F.3d at 252. Agency action that creates new rights or imposes new obligations on regulated parties or narrowly limits administrative discretion constitutes a legislative rule. *See Cmty. Nutrition*, 818 F.2d at 948; *accord Auto Safety*, 452 F.3d at 806. The language employed by the agency may play an important role in this analysis: a document that reads like an edict is likely to be binding, while one riddled with caveats is not. *See Nat'l Mining*, 758 F.3d at 252–53. Courts also consider how an agency has characterized a purported

guidance, and whether it was published in the Federal Register or the Code of Federal Regulations. *Auto Safety*, 452 F.3d at 806.

In following these principles, we have little trouble in concluding that the Notice is not a legislative rule.

**B.** *The Challenged Notice Is Nothing More Than a General Statement of Agency Policy or an Interpretive Rule*

The guidance offered in Notice N8900.240 reflects nothing more than a statement of agency policy or an interpretive rule. The Notice is therefore unreviewable. The Notice does not impose any obligation or prohibition on regulated entities. Neither does it create a new basis for enforcement or liability. Any carry-on baggage plan that was or would have been approved prior to the Notice is still permissible today. In other words, airlines "are free to ignore" the Notice. *Nat'l Mining*, 758 F.3d at 252 (internal quotation marks omitted).

This lack of legal effect matches the agency's description of the document's purpose: "This notice provides guidance to aviation safety inspectors . . . and [airlines] implementing policy that allows expanded use of [PEDs] throughout various phases of flight." Notice N8900.240 at 1. The quoted language describes the archetypal aim of a policy statement: to apprise the public of the agency's intentions, and to inform the decisions of those who exercise the agency's discretion. *See Cmty. Nutrition*, 818 F.2d at 949.

The Notice instructs aviation safety inspectors on what to look for when evaluating revised carry-on baggage programs, but it does not limit their discretion. In other words, "the

document as a whole does not read as a set of rules." *Wilderness Soc'y v. Norton*, 434 F.3d 584, 595 (D.C. Cir. 2006). Moreover, the Notice does not require airlines to revise their policies and documentation as a condition of allowing device usage during takeoff and landing. Instead, it states that such an expansion "may require" revised policies. Notice N8900.240 at 3. The airlines still have substantial leeway to establish PED policies under the applicable regulations.

Similarly, the Notice does not mandate specific changes to carry-on baggage programs, merely stating that airlines "may need to" make alterations. *Id.* This preserves the aviation safety inspectors' discretion to evaluate whether such changes are necessary in an individual case. And rather than listing explicit requirements that such modified carry-on baggage programs must meet, the Notice simply says that updated plans "*should* address the following *general concerns*." *Id.* at 3 (emphasis added).

The use of language like "may" and "should" instead of "shall" or "must" suggests that the provisions that follow are meant to be "precatory, not mandatory." *See Judd v. Billington*, 863 F.2d 103, 106 (D.C. Cir. 1988). Even if the Notice arguably inclines aviation safety inspectors towards certain outcomes when evaluating carry-on baggage programs, it does not constrain their discretion enough to create a binding norm. *See Panhandle Producers & Royalty Owners Ass'n v. Econ. Regulatory Admin.*, 822 F.2d 1105, 1110 (D.C. Cir. 1987) (noting that policy statements can create rebuttable presumptions). "An agency pronouncement is not deemed a binding regulation merely because it may have some substantive impact, as long as it leave[s] the administrator free to exercise his informed discretion." *Id.* (alteration in original) (internal quotation marks omitted).

Courts draw a line only when a purported guidance document "so fills out the statutory scheme that upon application one need only determine whether a given case is within the rule's criterion." *Ryder Truck Lines, Inc. v. United States*, 716 F.2d 1369, 1377 (11th Cir. 1983). The FAA has made it clear that the Notice is not intended to be a legislative rule – it is merely a non-binding guidance document of the sort that the agency routinely issues to offer advice to regulated parties and safety inspectors. There is nothing in the document to contradict the FAA's stated purpose. Because the Notice leaves aviation safety inspectors "free to consider the individual facts in the various cases that arise," *id.*, and it does not command any action by the airlines, it is clear that it does not establish a binding norm.

## C. *The Challenged Notice Is Not Contrary to Existing Regulations*

The AFA argues that Notice N8900.240 must be a legislative rule because it "effectively dismantled 14 C.F.R. § 121.589, a regulation that is still in effect and good law." Petitioner's Br. 9. It is true enough that "if a second rule repudiates or is irreconcilable with a prior legislative rule, the second rule must be an amendment of the first; and, of course, an amendment to a legislative rule must itself be legislative." *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1109 (D.C. Cir. 1993) (brackets and internal quotation marks omitted). However, we see no contradiction between the Notice and any FAA regulation. And, as noted above, it does not matter that the Notice may amend existing guidance documents. *Perez*, 135 S. Ct. at 1207–08; *Hudson*, 192 F.3d at 1035–36.

14 C.F.R. § 121.589 requires airlines to have an approved carry-on baggage program. It also requires that each article of

carry-on baggage be properly stowed in an appropriate location prior to takeoff and landing. But the regulation does not define carry-on baggage. That task is left to the airlines themselves as part of their responsibility to develop a carry-on baggage program. Advisory Circular No. 121-29B at 2. Longstanding FAA guidance instructs airlines to devise and submit "[a] list of specific items passengers can carry in the cabin and stow outside of specified carry-on baggage compartments" as part of their carry-on baggage program. *Id.* As a result, the regulation leaves airlines free to write carry-on baggage programs that do not include smartphones and similar devices in the definition of carry-on baggage.

The AFA points to a 2009 guidance document which they interpret to imply that the FAA previously considered small devices to be carry-on baggage. *See* FAA Information for Operators 09018, *Stowage of Items in Seat Pockets* (2009). This is irrelevant because the guidance document is simply a non-binding policy statement. Even if the AFA's reading is correct, the FAA is not obliged to continue following it. *See Perez*, 135 S. Ct. at 1206; *Hudson*, 192 F.3d at 1035–36.

The PED Committee's report provides further evidence that FAA regulations do not require small devices to be treated as carry-on baggage. The Committee found that "there is a lack of guidance regarding passenger personal items that must be stowed for takeoff and landing (i.e., a hard cover book can be held by a passenger, while a purse must be stowed)." PED Aviation Rulemaking Committee, *Recommendations on Expanding the Use of Portable Electronic Devices During Flight* (2013), at 16; *see also id.* at 22. And it is uncontested by the parties that airlines do not force passengers to stow small items like keys, smartphones, or books in approved carry-on baggage locations like overhead bins or under the seat. Instead, passengers are

generally allowed to hold such items in hand, on their laps, or in clothes pockets.

This court's jurisdiction to review FAA orders under 49 U.S.C. § 46110(a) extends only to those orders that constitute final agency action. Because Notice N8900.240 is non-binding guidance that does not conflict with existing regulations, this court is without jurisdiction to address AFA's challenge to the Notice.

### III. CONCLUSION

For the reasons set forth above, the petition is dismissed.

*So ordered.*