Rogers, Circuit Judge, dissenting:
On February 8, 2018, EPA formally announced in the Federal Register that "the plain language of the definitions of 'major source'... and of 'area source' in Section 112 of the [Clean Air Act] compels the conclusion that a major source becomes an area source at such time that the source takes an enforceable limit on its potential to emit [ ] hazardous air pollutants [ ] below the major source thresholds ...." 83 Fed. Reg. 5543 (Feb. 8, 2018) (emphasis added). "In such circumstances, a source that was previously classified as major ... will no longer be subject either to the major source [maximum achievable control technology] or other major source requirements that were applicable to it as a major source under CAA section 112." Id. Further, EPA stated this guidance memorandum "supersedes" the prior guidance in the May 1995 Seitz memorandum barring such reclassifications. Id. The guidance memorandum referred to in the Federal Register Notice was issued under the signature of William L. Wehrum, EPA Assistant Administrator for the Office of Air and Radiation. Petitioners now seek preenforcement review of the Wehrum Memorandum pursuant to 42 U.S.C. § 7607(b)(1), contending that the guidance memorandum is a legislative rule issued without notice and comment.
I.
Section 7607(b)(1) provides that this court shall have jurisdiction to review nationally applicable "final action taken" by the Administrator of EPA. 42 U.S.C. § 7607(b)(1). The term "final action" in Section 7607(b)(1) is synonymous with "final agency action" in the Administrative Procedure Act ("APA"), 5 U.S.C. § 704. Whitman v. Am. Trucking Ass'ns, Inc. , 531 U.S. 457, 478, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001). The finality inquiry itself is governed by the test articulated in Bennett v. Spear , 520 U.S. 154, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). Sackett v. EPA , 566 U.S. 120, 126-27, 132 S.Ct. 1367, 182 L.Ed.2d 367 (2012). An agency action is final if: (1) the action marks the "consummation of the agency's decisionmaking process," and (2) the action is one "by which rights or obligations have been determined, or from which legal consequences will flow." Bennett , 520 U.S. at 177-78, 117 S.Ct. 1154 (internal quotation marks and citation omitted) (emphases added).
The Supreme Court has "characterized the special judicial review provision of the CAA, 42 U.S.C. § 7607(b), as one of those statutes that specifically provides for 'preenforcement' review." Whitman , 531 U.S. at 479, 121 S.Ct. 903 (citing Ohio Forestry Ass'n, Inc. v. Sierra Club , 523 U.S. 726, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998) ). In addressing ripeness, the Court has pointed out that the CAA "permit[s] 'judicial review directly, even before the concrete effects normally required for APA review are felt.' " Id . at 479-80, 121 S.Ct. 903 (quoting Lujan v. National Wildlife Federation , 497 U.S. 871, 891, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) ). This *642 court, in turn, recognized that "Congress has emphatically declared a preference for immediate review with respect to Clean Air Act rulemaking," NRDC v. EPA , 643 F.3d 311, 320 (D.C. Cir. 2011) (internal quotations and citations omitted), which is what petitioners contend the Wehrum Memorandum is. So understood, the statutory scheme not only allows but encourages pre-enforcement review of final actions such as the Wehrum Memorandum.
A.
The court has repeatedly held that judicial review is available pursuant to Section 7607(b)(1) for guidance documents that bind EPA officials on how to make Title V permitting decisions.
In Appalachian Power Co. v. EPA , 208 F.3d 1015, 1020 (D.C. Cir. 2000), the court considered a guidance document instructing that a source's Title V permit must include periodic monitoring requirements to ensure compliance with certain federal or state standards. The guidance document thus reflected "a position [EPA] plans to follow in reviewing State-issued permits" and "a position EPA officials in the field are bound to apply." Id. at 1022. The court explained that the guidance document had legal consequences for both enforcement officials and regulated entities because it "reads like a ukase. It commands, it requires, it orders, it dictates." Id. at 1023. The court held that the guidance document was a final action over which the court had jurisdiction pursuant to Section 7607(b). Id. at 1022-23 & n.10.
Also, in National Environmental Development Ass'n's Clean Air Project v. EPA , 752 F.3d 999, 1007 (D.C. Cir. 2014), this court held that a guidance document on how EPA would determine whether groups of activities qualified as a "single stationary source" or multiple sources in Title V permits was a final action. The guidance document had legal consequences, the court explained, because it "provides firm guidance to enforcement officials about how to handle permitting decisions" and "compels agency officials" to apply certain permitting standards. Id. (emphasis in original). The court held that the guidance was "final agency action that is subject to judicial review" pursuant to Section 7607(b)(1). Id. at 1006-07.
Similarly, in the context of review of state implementation plans required by the CAA, the court held in Natural Resources Defense Council , 643 F.3d at 320, that a guidance document that "definitively interpreted" a provision of the CAA "altered the legal regime" because it required EPA officials to consider alternatives to a specific program when reviewing state implementation plans. The court explained that the guidance "binds EPA regional directors and thus qualifies as final." Id.
In sum, the court has repeatedly held that guidance documents, which on their face bind enforcement officials to apply a certain standard or interpretation under the CAA, including in the Title V context, are final actions subject to review pursuant to Section 7607(b)(1).
The Wehrum Memorandum states the law that EPA officials must apply in Title V permitting. Addressed to EPA Regional Air Division Directors, the Wehrum Memorandum "provides firm guidance to enforcement officials about how to handle permitting decisions." Nat. Envmtl. Dev. , 752 F.3d at 1007. By its express terms, the Wehrum Memorandum unequivocally provides the interpretation of Section 112 that is to be applied by EPA employees. See NRDC , 643 F.3d at 320. The Wehrum Memorandum explains that the plain text of Section 112 "compels the conclusion that a major source becomes an area source at such time that the source takes an enforceable *643 limit on its potential to emit ... below major source thresholds." Wehrum Memorandum at 1 (emphasis added). Referencing its legal consequences, the Wehrum Memorandum instructs that upon taking such a limit on its potential to emit below the major source thresholds, a source "will not be subject thereafter to those requirements applicable to the source as a major source under CAA section 112." Id. at 4 (emphasis added). Like the guidance document in Appalachian Power , 208 F.3d at 1023, the Wehrum Memorandum "reads like a ukase." It commands, orders, and dictates without caveats or disclaimers about the binding nature of its statutory interpretation. Compare id. , with Nat. Mining Ass'n v. McCarthy , 758 F.3d 243, 252-53 (D.C. Cir. 2014). It expressly "supersedes" EPA's prior interpretation, stating that the Seitz Memorandum is withdrawn, "effective immediately." Wehrum Memorandum at 1.
Under the statutory scheme, state permitting authorities are subject to the statutory interpretation announced in the Wehrum Memorandum stating EPA's unequivocal position. The Wehrum Memorandum directs EPA enforcement officials to send the memorandum to the States and thereby, in light of the Federal Register Notice, puts States doubly on notice that EPA's interpretation of Section 112 has changed, effective immediately. Given the text, structure, and purpose of the CAA, state permitting authorities are not free to ignore EPA's new interpretation of Section 112. The statutory scheme is based on a partnership between federal and state governments, whereby EPA sets federal standards and States develop implementation plans to set emissions limitations and standards to conform to these federal standards. Appalachian Power , 208 F.3d at 1019. "Typically, EPA delegates to the States its authority to require companies to comply with federal standards." Id . The terms and conditions in permits issued under Title V incorporate the applicable federal standards for individual sources. Id. Reinforcing that States must act in conformity with the Wehrum Memorandum, the CAA prohibits the Administrator of EPA from approving a state implementation plan under Title V except "to the extent that the program meets the requirements of [the CAA]." 42 U.S.C. § 7661a(d)(1). If a State proposes to issue an individual permit that does not comply with the CAA requirements, then the Administrator "shall" object. Id. § 7661d(b)(1). The Administrator is authorized to modify an individual permit. Id. § 7661d(e). The CAA even contemplates that a state permitting authority can be sanctioned for not adequately administering and enforcing a program. Id. § 7661a(i).
In sum, by announcing an unequivocal interpretation of which federal standards apply to which sources under the CAA, "EPA expects States to fall in line." Appalachian Power , 208 F.3d at 1023. Through the Wehrum Memorandum, EPA has instructed its employees that the plain text of the CAA includes no temporal limitation on the reclassification of "major sources." By publicly announcing an unequivocal statement that the plain text of the CAA "compels" its conclusion, EPA has given States their "marching orders" to allow reclassification of major sources. Id. And States have heeded EPA's direction. See, e.g. , Kuiken Decl. ¶¶ 6, 11 & Att.; McCloud Decl. ¶¶ 6, 10 & Att.; Gharrity Decl. Att. (Ohio EPA publication providing guidance to regulated entities treating the Wehrum Memorandum as binding); see also Standing Add. 43, 45, 48, 52-53, 57, 275.
Therefore, under this court's precedent issuance of the Wehrum Memorandum is final action subject to judicial review pursuant to Section 7607(b)(1) because it provides *644 EPA's unequivocal interpretation on the reclassification of "major sources," thereby binding EPA enforcement officials.
B.
Contrary to the court's conclusion, the Wehrum Memorandum is final action under the two-prong Bennett v. Spear test. 520 U.S. at 177-78, 117 S.Ct. 1154. First, the Wehrum Memorandum marks the consummation of EPA's decisionmaking process with respect to its interpretation of whether Section 112 of the CAA allows major sources to reclassify as area sources at any time. The Wehrum Memorandum is unequivocal - if a major source "takes an enforceable limit on its potential to emit ... below the major source thresholds," the CAA "compels" that the source can reclassify as an area source at that time. Wehrum Memorandum at 1. It states the official position of the EPA Administrator; in signing the guidance memorandum, the Assistant Administrator for the Office of Air and Radiation was acting on behalf of the Administrator. See 40 C.F.R. § 1.41 ; Her Majesty the Queen in Right of Ontario v. EPA , 912 F.2d 1525, 1532 (D.C. Cir. 1990). Addressed to the Regional Air Division Directors, it instructs the Regional offices on what Section 112 of the CAA "compels," and to "send this memorandum to states within their jurisdiction." Id. at 4. By Federal Register Notice, EPA announced to the public it had abandoned its prior interpretation and now concluded the plain text of Section 112 imposed no temporal limit on reclassifications by "major sources." 83 Fed. Reg. at 5543. Regardless of whether EPA may change its position in the future, see, e.g. , Gen. Elec. Co. v. EPA , 290 F.3d 377, 380 (D.C. Cir. 2002) ; Appalachian Power , 208 F.3d at 1022, the Wehrum Memorandum marks EPA's unequivocal statutory interpretation of whether "major sources" may, at any time, reclassify under the CAA upon limiting their potential to emit hazardous pollutants.
Second, the Wehrum Memorandum is an action "from which legal consequences will flow" because it announces a binding change in the legal regime. Bennett , 520 U.S. at 178, 117 S.Ct. 1154 (emphasis added); see also U.S. Army Corps of Engineers v. Hawkes Co. , --- U.S. ----, 136 S. Ct. 1807, 1814-15, 195 L.Ed.2d 77 (2016) ; NRDC , 643 F.3d at 319-20 ; Indep. Equip. Dealers Ass'n v. EPA , 372 F.3d 420, 427 (D.C. Cir. 2004) ; Appalachian Power , 208 F.3d at 1020-21. The Wehrum Memorandum alters the legal regime by changing the regulatory requirements for any "major source" that "takes an enforceable limit on its potential to emit ... below major source thresholds." Wehrum Memorandum at 1. Those sources now have the opportunity to reclassify as area sources at any time by limiting their potential to emit below major source thresholds and thereafter will not be subject to the more onerous major source requirements, such as the Maximum Achievable Control Technology standards.
The court's recent decision in Valero Energy Corp. v. EPA , 927 F.3d 532 (D.C. Cir. 2019) reaffirms that legal consequences will flow from the Wehrum Memorandum. There, the court held legal consequences did not flow from a guidance document that interpreted EPA's duty to conduct "periodic reviews" of renewable fuel standards under 42 U.S.C. § 7545(o)(11) and explained how EPA's prior actions fulfilled any statutory duty to conduct periodic reviews. Id. at 535. The document did not purport bind EPA to its interpretation and had no identifiable effect on the regulated community. Id. at 536-37. Here, in contrast, the Wehrum Memorandum announces a binding interpretation that has an identifiable effect on *645 major sources that take enforceable limits on their potential to emit below major source thresholds.
EPA's contrary position, that the Wehrum Memorandum is not final because it has no immediate impact or direct legal consequences for specific sources, misstates the finality test. "The test for finality ... is not so narrow - it is met if 'the action [is] one by which rights or obligations have been determined, or from which legal consequences will flow.' " Harris v. FAA , 353 F.3d 1006, 1011 (D.C. Cir. 2004) (quoting Bennett , 520 U.S. at 178, 117 S.Ct. 1154 ) (emphasis added). The court's suggestion that the Wehrum Memorandum is "all bark and no bite," Op. 637, ignores its plain text as well as the second clause of the second prong of the Bennett v. Spear test. With EPA's blessing, legal consequences will flow from the Wehrum Memorandum no later than when "major sources" take enforceable limits on their potential to emit below "major source" thresholds and obtain new or modified Title V permits. Indeed, such legal consequences have already occurred; EPA acknowledged that at least two "major sources" in Indiana have reclassified as area sources as of filing of the briefs in the instant appeal, and the Sierra Club has identified numerous other "major sources" that are eligible to reclassify. Resp't's Br. 29; Kuiken Decl. ¶ 6 & Att.; McCloud Decl. ¶ 5 & Att.
Additionally, the opportunity for judicial review at a later time has no direct bearing on the availability of pre-enforcement review of the Wehrum Memorandum. Section 7661d provides for judicial review under Section 7607 of an Administrator's objection or denial of a petition to object to a specific Title V permit for a specific source. 42 U.S.C. § 7661d(b). Petitioners are not challenging a source-specific objection. Instead, they seek review of a generally applicable guidance document pursuant to Section 7607(b), which provides for judicial review of such a general guidance document that is a "final action." Id. § 7607(b)(1). The two provisions for judicial review serve different purposes. Judicial review of national standards at the start of the regulatory process can ensure that Congress's intent is being carried out before States and the regulated community must take costly implementing actions, while later enforcement review can ensure compliance with terms and conditions in individual permits. Nothing in the text, structure, purpose, or legislative history of the CAA indicates the availability of review of a decision in a source-specific Title V proceeding under Section 7661d would preclude pre-enforcement review of a general guidance document under Section 7607(b). That both exist in the CAA is a rational approach for complex legislation where Congress intended to bring about significant changes to the status quo impacting the environment, the public, and entities emitting hazardous air pollutants. See Appalachian Power , 208 F.3d at 1017 ; see generally Hon. Henry A. Waxman, An Overview of the Clean Air Act Amendments of 1990 , 21 ENVTL. L. 1721, 1723, 1742 (1991). Put otherwise, the provision of judicial review of Title V permit decisions "in one section of a long and complicated statute" is hardly sufficient to overcome Congress's decision to provide pre-enforcement review. See Sackett , 132 S. Ct. at 1373. Not only does nothing in the text of Section 7661d override the provision for pre-enforcement review under Section 7607(b), the Supreme Court has acknowledged the CAA encourages pre-enforcement judicial review. See Whitman , 531 U.S. at 479, 121 S.Ct. 903 (quoting Ohio Forestry , 523 U.S. at 737, 118 S.Ct. 1665 ); see also NRDC , 643 F.3d at 320.
Furthermore, Congress's express purpose in enacting the CAA was "to promote *646 the public health and welfare and the productive capacity of [the Nation's] population." 42 U.S.C. § 7401(b)(1). Delaying the opportunity for judicial review until individual source permit enforcement proceedings could effectively squelch the opportunity for regulatory beneficiaries to obtain judicial review of an agency's position. See Nina A. Mendelson, Regulatory Beneficiaries and Informal Agency Policymaking , 92 CORNELL L. REV. 397, 420-24 (2007) ("Mendelson"). Title V does provide regulatory beneficiaries the opportunity to file a petition to object and to seek judicial review of denial of a petition to object in individual permitting proceedings. 42 U.S.C. § 7661d(b)(2). Yet requiring regulatory beneficiaries to monitor and to file petitions in individual permit proceedings throughout the United States requires resources that may constrain beneficiaries' ability to seek judicial review. See Mendelson at 451-52. Pre-enforcement judicial review of a nationally applicable guidance document, in contrast, is more accessible for regulatory beneficiaries. Precluding pre-enforcement review would impose a burden Congress has not required.
Notably, irrelevant to the finality inquiry is the fact that the Wehrum Memorandum is deregulatory rather than regulatory. This is the fallacy underlying the court's efforts to distinguish our precedent on the basis that the Wehrum Memorandum does not require anyone to do anything. See Op. 640. Although the Supreme Court and this court have regularly been confronted with challenges to regulatory actions as too strong or too weak and held that agency actions that require parties to take certain actions or expose parties to penalties are final, see, e.g. , Hawkes, 136 S. Ct. at 1814-15 ; Sackett , 566 U.S. at 126, 132 S.Ct. 1367 ; Nat. Mining Ass'n , 758 F.3d at 252 ; CSI Aviation Servs., Inc. v. DOT , 637 F.3d 408, 412-13 (D.C. Cir. 2011), the focus of the inquiry has been on whether the legal regime has changed. The Wehrum Memorandum changed the legal regime by enabling certain regulated entities to become subject to decreased regulation - an opportunity not clearly available under the CAA, much less under EPA's prior interpretation. Prior to EPA's issuance of guidance, enforcement officials had discretion to interpret the CAA as either allowing or prohibiting "major source" reclassification after the first compliance date. See NRDC , 643 F.3d at 319-20. Now that discretion has been withdrawn as regulated "major sources" are eligible to be reclassified at any time upon taking emissions limitations.
Further, the Supreme Court has held that legal consequences can flow from the "denial of a safe harbor." Hawkes , 136 S. Ct. at 1814. In Scenic America, Inc. v. DOT , 836 F.3d 42, 56 (D.C. Cir. 2016), this court recognized that legal consequences would flow from a guidance document that created a safe harbor whereby digital billboard permits would not be denied on the basis of violating certain standards. And in determining whether a document was a "rule" under the Toxic Substance Control Act in General Electric , 290 F.3d at 384-85, this court held that a guidance document that "appears to bind [EPA] to accept applications using a total toxicity factor of 4.0 (mg/kg/day)-1" imposed binding obligations, explaining that "if the language of the document is such that private parties can rely on it as a norm or safe harbor by which to shape their actions, it can be binding as a practical matter." Id. at 383 (quoting Robert A. Anthony, Interpretive Rules, Policy Statements, Guidances, Manuals, and the Like-Should Federal Agencies Use Them to Bind the Public? , 41 DUKE L.J. 1311, 1328-29 (1992) ). The Wehrum Memorandum creates a safe harbor for "major sources" by removing a prior barrier to reclassification *647 - those sources that take an enforceable limit on their potential to emit below the "major source" threshold are assured that they will be subject to decreased regulation with EPA's support. This safe harbor has a "clear legal effect on regulated entities." See Scenic America , 836 F.3d at 56.
For these reasons, the Wehrum Memorandum is final action, reviewable pursuant to Section 7607(b)(1). It is an agency action with the telltale signs of finality - it presents a unequivocal interpretation of requirements under the CAA; it is binding on its face; and it altered the legal regime by providing an opportunity for "major sources" that take enforceable limits on their potential to emit below the "major source" thresholds to reclassify as "area sources" at any time. "Once the agency publicly articulates an unequivocal position ... and expects regulated entities to alter their primary conduct to conform to that position, the agency has voluntarily relinquished the benefit of postponed judicial review." Ciba-Geigy Corp. v. EPA , 801 F.2d 430, 436 (D.C. Cir. 1986).
II.
The question remains whether the Wehrum Memorandum is an agency action ripe for review. To decide whether an agency's action is ripe for review, courts generally consider the "fitness of the issues for judicial decision" and the "hardship to the parties of withholding court consideration." Ohio Forestry , 523 U.S. at 733, 118 S.Ct. 1665 (quoting Abbott Labs. v. Gardner , 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) ). In Appalachian Power , 208 F.3d at 1023 n.18, the court held that a guidance document that reflected EPA's settled position regarding periodic monitoring requirements in Title V permits was ripe for review because the propriety of EPA's statutory interpretation would "not turn on the specifics of any particular permit." Id. EPA's guidance document was "national in scope and Congress clearly intended this court to determine the validity of such EPA actions," see 42 U.S.C. § 7607, yet "[a] challenge to an individual permit would not be heard in this court," Appalachian Power , 208 F.3d at 1023 n.18.
The same is true here. Whether EPA was required, as petitioners contend, to promulgate the Wehrum Memorandum through notice-and-comment rulemaking and whether EPA's statutory interpretation in the Wehrum Memorandum is proper will not turn on the specifics of any particular permit. EPA has announced that "a major source that takes an enforceable limit on its [potential to emit] ... no matter when the source may choose to take measures to limit its [potential to emit] ... will not be subject thereafter to those requirements applicable to the source as a major source under CAA section 112." Wehrum Memorandum at 4 (emphasis added). Its guidance is national in scope, as the court looks only to the face of an agency action to determine whether the action is nationally applicable. Dalton Trucking, Inc. v. EPA , 808 F.3d 875, 881 (D.C. Cir. 2015) ; Am. Road & Trans. Builders Ass'n v. EPA , 705 F.3d 453, 456 (D.C. Cir. 2013). Any objection or denial of a petition to object to a Title V permit would apply solely to the specific source applying for the Title V permit; inclusion of a general statutory interpretation that may apply as precedent in future Title V permit proceedings would not render the action nationally applicable under 42 U.S.C. § 7607(b)(1). See Sierra Club v. EPA , 926 F.3d 844, 849-50 (D.C. Cir. 2019). Concluding that petitioners' challenges are not ripe until the Wehrum Memorandum is applied in an individual Title V permit proceeding would frustrate Congress's intent that "nationally applicable"
*648 actions such as the Wehrum Memorandum be reviewable in this court pursuant to 42 U.S.C. § 7607(b)(1). Under the court's approach, challenges would instead be directed to appropriate regional courts. See Op. 637-38; see e.g. , Sierra Club , 926 F.3d at 847-50.
In any event, petitioners' challenges are fit for judicial review because they present purely legal issues. See Nat. Envtl. Dev. , 752 F.3d at 1008 ; Gen. Elec. , 290 F.3d at 380. Whether Section 112 of the CAA allows "major sources" to reclassify as "area sources" at any time upon taking enforceable limits on their potential to emit is a question of statutory interpretation that will not benefit from further factual development. See Ohio Forestry , 523 U.S. at 733, 118 S.Ct. 1665. Given EPA's conclusion that the plain text "compels" the interpretation in the Wehrum Memorandum, this is not a circumstance in which judicial review would hinder EPA's effort to refine its position. See id . at 735, 118 S.Ct. 1665. Nor will petitioners' claims under the APA be affected by further factual development. See Gen. Elec. , 290 F.3d at 380. In view of Congress's stated preference for immediate review under the CAA, NRDC , 643 F.3d at 320, the court need not consider hardship to the parties of delaying review, see Cement Kiln Recycling Coal. v. EPA, 493 F.3d 207, 215 (D.C. Cir. 2007) ; Gen. Elec. , 290 F.3d at 381. As noted, the CAA is a statute that "permit[s] judicial review directly, even before the concrete effects normally required for APA review are felt." Whitman , 531 U.S. at 479, 121 S.Ct. 903 (quoting Lujan v. Nat'l Wildlife Fed'n , 497 U.S. 871, 891, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) ).
III.
The APA requires that a legislative rule, which carries the "force and effect of law," Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta , 785 F.3d 710, 716 (D.C. Cir. 2015) (quoting Perez v. Mortgage Bankers Ass'n , --- U.S. ----, 135 S. Ct. 1199, 1204, 191 L.Ed.2d 186 (2015) ), must be promulgated pursuant to notice-and-comment rulemaking. Id. To determine whether agency action carries the force and effect of law, the court generally looks to the actual legal effect (or lack thereof) of the agency action, paying particular attention to the express words used in the document. Flight Attendants , 785 F.3d at 717 ; Nat. Mining , 758 F.3d at 252. "[A] document that reads like an edict is likely to be binding, while one riddled with caveats is not." Flight Attendants , 785 F.3d at 717. The court also considers whether the action was published in the Federal Register or the Code of Federal Regulations, and whether the action has binding effects on the agency or private parties. Ctr. for Auto Safety v. Nat. Highway Traffic Safety Admin. , 452 F.3d 798, 806-07 (D.C. Cir. 2006) (citing Molycorp, Inc. v. EPA , 197 F.3d 543, 545 (D.C. Cir. 1999) ); see also Flight Attendants , 785 F.3d at 717 ; Nat. Mining , 758 F.3d at 252. An agency's adoption of a binding norm that could not be properly promulgated absent the notice-and-comment rulemaking required by the APA "obviously would reflect final agency action." Ctr. for Auto Safety , 452 F.3d at 804 ; see also Flight Attendants , 785 F.3d at 716. When an agency action is final because it creates a binding norm that alters the legal regime, the question of whether the action is a legislative rule is "easy." NRDC , 643 F.3d at 320.
That is the situation here. The Wehrum Memorandum makes its legal effect clear; it "reads like an edict," Flight Attendants , 785 F.3d at 717, instructing regional offices that the "unambiguous language" of Section 112 of the CAA "compels" "major source" reclassifications. Wehrum Memorandum at 1, 3. The document itself contains *649 no disclaimers or caveats. Upon taking an enforceable limit on their potential to emit "below major source thresholds," major sources "will not be subject thereafter" to "major source" regulations. Id. at 4 (emphasis added). EPA's Federal Register Notice announced the new interpretation and binds EPA to the changed legal regime. As such, the Wehrum Memorandum is a legislative rule that failed to conform to the APA's notice-and-comment requirement. Cf. Gen. Elec. , 290 F.3d at 385.
Accordingly, I would grant the petitions for review and vacate the Wehrum Memorandum, and I respectfully dissent.